**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL S. KAKOCZKI,** | ) | |
| | ) | **No. 14 CV 9207** |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of the U.S. Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Claimant Michael Kakoczki ("Claimant") seeks judicial review under 42 U.S.C. § 405(g) of a final decision of Defendant Commissioner of the Social Security Administration ("SSA") denying his claim for Social Security Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act ("the Act"). The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Before the court is Claimant's motion to reverse the decision of the Commissioner's (Dkt. 20) and the Commissioner's motion for summary judgment (Dkt. 30). For the reasons that follow, Claimant's motion is granted and the Commissioner's motion is denied. This case is remanded to the SSA for further proceedings consistent with this opinion.

## I.     BACKGROUND

### A.     Procedural History

On May 23, 2011, at the age of eighteen, Claimant filed a Title XVI SSI application alleging a disability due to bipolar disorder, obsessive compulsive disorder

("OCD"), seizure disorder, anxiety, memory deficit, and learning disability beginning May 1, 2011. (R. 177, 180-88.) The application was denied initially on October 18, 2011 and upon reconsideration on January 26, 2012. (R. 68-69.) After both denials, Claimant filed a timely request for a hearing, which was initially scheduled for June 15, 2012 before an Administrative Law Judge ("ALJ"). (R. 27-37, 85-86.) Claimant appeared for the hearing without a representative. (R. 27-37.) After being informed of his rights to representation, the hearing was rescheduled to provide time for Claimant to seek counsel. (*Id.*) On March 6, 2013 Claimant appeared for the rescheduled hearing along with his representative and his mother. (R. 38-67.) A Vocational Expert ("VE") was also present to offer her testimony. (*Id.*) On April 26, 2013, the ALJ issued a written determination finding Claimant not disabled and denying his SSI application. (R. 10-21.) Claimant sought review by the Appeals Council ("AC"), which was denied on September 16, 2014. (R. 1-3.)

**B.    Medical Evidence**

Claimant's medical records indicate that he has been a patient at Dreyer Medical Clinic ("Dreyer") since January 2010. (R. 534.) Dr. Carlos Barrios initially tended to Claimant on January 18, 2010 for psychotherapy and medication management. (*Id.*) At the time, Claimant's symptoms included grandiose features such as commandeering attitude, flight of ideas, hyper-verbal speech, reckless activities, and mood swings. (*Id.*) He was prescribed Abilify for bipolar disorder, Intuniv for Attention Deficit Hyperactive Disorder ("ADHD"), and Lamictal as a mood stabilizer. (R. 535.) Dr. Barrios noted he was in otherwise stable condition. (*Id.*)

On May 6, 2010, Dr. Ammar Katerji, Claimant's former pediatric neurologist, wrote a letter regarding his treatment of Claimant. (R. 620-21.) Dr. Katerji listed Claimant's impairments as a learning disability, behavior difficulty, ADHD, and seizure disorder. (R. 620.) Dr. Katerji noted that Claimant improved on his medication, but Claimant felt his medication caused tremors and anxiety. (*Id.*) Dr. Katerji suggested that Claimant remain on his medication. (*Id.*)

Claimant continued to visit Dr. Barrios at Dreyer for psychotherapy. Throughout the course of his visits, Claimant reported having altercations with his mother's boyfriend. (R. 543-44.) On July 27, 2010, he reported knee pain without specific injury. (R. 545-46.) After a review of an x-ray, Dr. Barrios concluded that Claimant did not have any fracture or dislocation, but suggested that Claimant lose weight. (R. 549-50, 616-17.) On September 28, 2010, after complaints of drowsiness, Dr. Barrios decreased his dosage of Abilify. (R. 551-52.) On November 8, 2010, Claimant reported decreased drowsiness and felt energetic enough to return to the gym. (R. 555-56.) On March 14, 2011, Dr. Barrios reported that Claimant was dealing reasonably well with his medication and he had good control of his symptoms. (R. 564.) He further reported that Claimant was looking for a job and planned to graduate high school and attend college. (*Id.*) Claimant asked Dr. Barrios about decreasing his medication and it was agreed that his Intuniv dosage would be decreased. (Id.)

On July 10, 2011, Claimant began to see Dr. John Zhang at Dreyer. (R. 580-81.) Dr. Zhang noted that Claimant had a history of temporal lobe epilepsy, which causes mood and behavioral disturbances and cognitive impairments. (R. 581.) Dr. Zhang continued to prescribe Claimant Abilify and Intuniv. (*Id.*) On September 28, 2011,

Claimant saw Dr. Brian O'Shaughnessy at Dreyer, who noted that after a neurological examination, he found no significant abnormalities.  (R. 592.)  He noted that Claimant's headaches may be migraines, but they are "not frequent enough" to warrant preventative medication.  (*Id.*)  Dr. O'Shaugnessy also stopped his antiepileptic medication, as Claimant no longer had seizures.  (*Id.*)  Dr. O'Shaugnessy's assessments regarding Claimant's seizures are supported by Dr. Katerji, who noted on November 9, 2010 that Claimant had not had "any seizures for a period of time."  (R. 367.)

On September 21, 2011, state agency doctor Dr. Glen Wurglitz completed Claimant's psychological evaluation.  (R. 493-99.)  Dr. Wurglitz noted that Claimant's mood was pleasant and stable during the evaluation.  (R. 495.)  He had a friendly interaction style and his speech quality was steady.  (*Id.*)  He was oriented to person, place, time, and the purpose of the office visit.  (*Id.*)  With regard to his short-term memory, Dr. Wurglitz found Claimant's memory to be poor and he was unable to remember names and could not recall items without assistance.  (*Id.*)  Dr. Wurglitz found Claimant to be cognitively capable of performing tasks with complex instruction. (R. 496-97.)  He also found Claimant to be capable of understanding, remembering, and carrying out detailed instructions.  (R. 497.)  Dr. Wurglitz further opined that Claimant had social traits that may interfere with his interactions with supervisors, coworkers, and the general public to a mild or moderate degree.  (*Id.*)  Dr. Wurglitz assessed bipolar disorder, learning disorder, ADHD, history of epilepsy, and educational and occupational problems.  (*Id.*)  He gave Claimant a GAF score of 61.  (*Id.*)

On September 27, 2011, Dr. Roopa Karri of Disability Determination Services completed an internal medical consultative examination. (R. 501-04.) A physical exam returned normal results. (R. 503.) Dr. Karri noted that Claimant had a history of bipolar disorder, anxiety, and a learning disability. (R. 504.) Dr. Karri also reported that Claimant had a history of seizures, but that they were under control even without medication. (*Id.*) Finally, Dr. Karri noted that Claimant was obese. (*Id.*)

On October 7, 2011, Dr. Ellen Rozenfeld completed a Psychiatric Review Technique Form ("PRTF") and a mental Residual Functional Capacity ("RFC") assessment. (R. 505-22.) In the PRTF form, Dr. Rozenfeld assessed Claimant for several listings impairments, such as 12.02 for organic mental disorders, 12.04 for affective disorders, and 12.09 for substance addiction disorders. (R. 505.) Dr. Rozenfeld noted that Claimant had mild limitations in activities of daily living and moderate limitations in maintaining social functioning, as well as maintaining concentration, persistence, and pace. (R. 515.) Dr. Rozenfeld reviewed Claimant's medical file and determined Claimant's allegations regarding his activities of daily living were consistent with his medically determinable impairments. (R. 517.) However, Dr. Rozenfeld noted that while Claimant had a long history of treatment, the record showed that he was "doing fairly well." (*Id.*) She also noted that Claimant had a severe mental impairment that does not meet or equal a listing impairment and he retained the sufficient mental capacity to perform operations of a routine and simple nature on a sustained basis. (R. 517.)

In her mental RFC assessment, Dr. Rozenfeld found that Claimant would be moderately limited in his ability to understand, remember, and carry out detailed

instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. 519-20.) Dr. Rozenfeld opined that Claimant retained the mental capacity to concentrate on, understand, and remember routine and repetitive instructions. (R. 521.) She further opined that his ability to carry out tasks with adequate persistence and pace would be limited for complex tasks but adequate for routine and repetitive tasks. (*Id.*) She stated that Claimant would be capable of following an ordinary routine without special supervision and he could make simple, work-related decisions. (*Id.*) Dr. Rozenfeld concluded that Claimant would be able to work in proximity with others but not on joint or shared tasks. (*Id.*) He would be able to handle supervisory contact and his ability to handle stress would be adequate to tolerate routine changes in the workplace. (*Id.*)

On March 19, 2012, Dr. Barrios wrote a note to the SSA to provide clinical information regarding Claimant's impairments. (R. 626-27.) He reported that he treated Claimant from 2008 through 2011 and during this time, he was diagnosed with bipolar disorder and ADHD. (R. 626.) Dr. Barrios noted that Claimant's bipolar symptoms include mood lability, impulsive behavior, anger problems, physical aggression, and anxiety. (*Id.*) Dr. Barrios further noted that Claimant had difficulty maintaining self-hygiene, conducting household chores, working on his own, or managing money. (R. 627.)

On July 6, 2012, Claimant was admitted to Provena Medical Center after experiencing homicidal ideations and hallucinations. (R. 633-34.) He was diagnosed

with bipolar disorder and temporal lobe epilepsy.  (R. 634.)  He was instructed at discharge to follow-up with Dr. Zhang.  (Id.)

## C.    Individualized Education Program ("IEP")

Claimant has been through several IEPs throughout the course of his education. In April 1998, Claimant's academic performance was evaluated by Aurora Public School.  (R. 301-08.)  Claimant's communication skills were below average and it was noted that he was weak in his auditory memory.  (R. 303.)  It was determined that he was eligible for special education based upon his performance.  (R. 304.)

From 2005 through 2006, Claimant underwent a reevaluation with West Aurora. (R. 314-50.)  Claimant's math and verbal testing scores were in the impaired range.  (R. 324.)  It was noted that he had trouble remembering and understanding what people say, understanding new ideas, answering questions, and all aspects of reading and writing.  (R. 328.)  While he passed his classes, Claimant's teachers remained concerned with his behavior in unstructured settings.  (R. 329.)  After the evaluation, it was determined that Claimant remained eligible for special education.  (R. 314.)

In May 2011, another evaluation was conducted by West Aurora High School. (R. 409-34.)  It was noted that Claimant continued to have deficits in the areas of math, reading, writing, and short-term memory.  (R. 432.)  However, he had made positive contributions to class and "most of his work gets turned in."  (R. 416.)  His social and emotional status was not listed as a concern during the reevaluation.  (*Id.*)  While he continued to pass his classes, his grades were low.  (*Id.*)  Because of his medications, he was often drowsy in class, however it was determined that Claimant was capable of

functioning well while awake.  (*Id.*)  At the end of the evaluation, he was found eligible to continue his special education services.  (R. 409.)

## D.    Claimant's Testimony

 Claimant was present during the rescheduled March 6, 2013 hearing and offered testimony.  (R. 38-67.)  He testified that he completed high school but dropped out of college after one week.  (R. 42.)  He further testified that he lives at home with his mother and stepfather.  (*Id.*)  Claimant explained that he was formerly employed at Jewel but stopped working because he was stressed and confused.  (R. 43.)  He got confused because he was being told to do too many tasks at once.  (R. 54.)

Claimant could not remember the last time he had a seizure but testified that he was taking medication to control his epilepsy.  (R. 44.)  He denied any side effects from the medication.  (*Id.*)  Claimant sometimes has feelings of low self-esteem and sometimes has difficulty concentrating and focusing.  (*Id.*)  He also has memory loss. (*Id.*)  He suffers crying spells once a month due to his depression.  (R. 45.)  He also suffers from panic attacks and anger spells around twice a week.  (*Id.*)  Claimant has difficulty sleeping and generally only sleeps for five hours.  (R. 48.)  The only hospitalization Claimant could recall was when he was younger due to medication problems.  (R. 47.)

With respect to chores, Claimant testified that he usually completes his chores once a week.  (R. 49.)  He is able to manage his personal care, get dressed, shower, clean his room, and prepare food to eat.  (*Id.*)  He can also do laundry, wash the dishes, vacuum, and take out the garbage.  (R. 50.)  Claimant stated that he does not watch much television but plays video games often.  (R. 52.)  He also helps take care of his

dog. (*Id.*) Claimant spends time with his friends and families. (R. 51.) He testified that he no longer goes to the gym because he wants to spend time with his mom and help around the house. (*Id.*)

**E.      Witness Testimony**

Claimant's mother was also present at the hearing and offered testimony. She testified that she had to offer assistance to Claimant when he was working at Jewel by setting his alarm and giving him his medication. (R. 60.) She further stated that Claimant was very stressed and overwhelmed at the job and would often get headaches that lasted for days. (R. 61.) With regard to his seizures, Claimant's mother testified that he has not had a seizure since 2010. (R. 63.) However, Claimant's mother stated that he has been struggling with his bipolar disorder and anxiety for many years and it affects his daily life. (*Id.*) She stated that he cannot handle money, cannot understand the concept of time, and has trouble retaining information. (*Id.*)

**F.      VE Testimony**

The VE described Claimant's previous job at Jewel as a bagger. (R. 65.) The ALJ asked the VE whether an individual with Claimant's age, education, and work experience, but who could not have contact with the public and is restricted to two to three step simple, repeated, and routine tasks, would be able to perform any jobs in the national economy. (*Id.*) The VE stated that such an individual would be precluded from performing his past job as a bagger but there are packager jobs available. (*Id.*) The VE also found that Claimant would be able to perform sorting and assembling jobs. (R. 66.) If Claimant is incapable of sustaining full-time employment, the VE testified that he

would not be employable.  (*Id.*)  The VE also stated that Claimant would be precluded

from all competitive work if he was off-task for at least 15 percent of the workday.  (*Id.*)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

Because the Appeals Council denied review, the ALJ's findings constitute the

final decision of the agency.  (R. 1-3); *see Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir.

1994).  The findings of the ALJ as to any fact, if supported by substantial evidence, shall

be conclusive.  42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th

Cir. 2002); 42 U.S.C. § 1383 ("The final determination of the Commissioner after a

hearing under paragraph (1) shall be subject to judicial review as provided in section

405(g) of this title to the same extent as the Commissioner's final determinations under

section 405 of this title.")  Although the court affords great deference to the ALJ's

determination, it must do more than merely rubber stamp the ALJ's decision.  *See*

*Griffith v. Sullivan*, 916 F.2d 715 (7th Cir. 1990) (citing *Delgado v. Bowen*, 782 F.2d 79,

82 (7th Cir. 1986)).  In order to affirm the ALJ's decision, the court must find the

decision to be supported by substantial evidence on the record as a whole, and must

take into account whatever in the record fairly detracts from its weight.  *See Universal*

*Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951).  Substantial evidence is more

than a mere scintilla; it is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  *See Kepple v. Massanari,* 268 F.3d 513 (7th Cir.

2001) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The court may not displace the ALJ's judgment by reconsidering facts or

evidence or making credibility determinations.  *See Skinner v. Astrue*, 478 F.3d 836,

841 (7th Cir. 2007). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that determination falls upon the ALJ, not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). An ALJ must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the court may afford the claimant meaningful review of the ALJ's ultimate findings. *See Pepper v. Colvin*, 712 F.3d 351 (7th Cir. 2013). It is not enough that the record contains evidence to support the ALJ's decision and the court must remand if the ALJ does not rationally and sufficiently articulate the grounds for that decision, so as to prevent meaningful review. (*Id.*)

**B.     Analysis under the Social Security Act**

To qualify for Social Security benefits, a claimant must be under a disability within the meaning of the Act. A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002). Pursuant to the Act, Claimant is disabled only if her physical or mental impairments are of such severity that she is unable to do her previous work and cannot, when "considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives, or whether a specific job vacancy exists for her, or whether she would be hired if she applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process for determining whether Claimant is disabled.  *See* 20 C.F.R. § 404.1520(a).  This five-step sequential evaluation process requires the ALJ to inquire:

1.      Is Claimant presently engaging in substantial gainful activity?  *See* 20 C.F.R. § 404.1572 *et seq.*

2.      Does Claimant have a severe medically determinable physical or mental impairment that interferes with work and is expected to last at least 12 months?

3.      Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?  *See* 20 C.F.R. § Pt. 404, Subpt. I, App. 1.

4.      Is Claimant unable to perform her former occupation?

5.      Is Claimant unable to perform any other work?

20 C.F.R. § 404.1520(a)(4); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).  Claimant has the burden of establishing steps one through four.  At step five the burden shifts to the Commissioner to establish that Claimant is capable of performing work.  *See Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.      ALJ's Determination**

On April 26, 2013, the ALJ issued a written decision denying Claimant's SSI application.  (R. 10-21.)  At the first step, the ALJ determined that Claimant had not engaged in substantial gainful activity since his alleged onset date.  (R. 15.)  At step two, the ALJ found that Claimant has the severe impairments of seizure disorder, bipolar disorder, learning disability, and ADHD.  (*Id.*)  At step three, the ALJ found that Claimant does not have an impairment or a combination of impairments that meet or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, App'x 1.  (R. 15-16.)  Before step four, the ALJ determined that Claimant had the RFC to perform a full range of work at all exertional levels but with certain non-exertional limitations, such as the inability to climb ladders, ropes, or scaffolds, avoiding concentrated exposure to work hazards such as unprotected heights and moving machinery, avoiding public contact other than occasional contact with coworkers and supervisors, and performing only two to three step repeated routine tasks.  (R. 17.)  In so finding, the ALJ evaluated the medical opinions of Claimant's treating physicians and found they did not deserve controlling weight.  (R. 18-19.)  The ALJ also did not find Claimant's allegations regarding his symptoms to be fully credible.  (R. 18.)  At step four, the ALJ concluded that Claimant did not have any past relevant work.  At step five, after taking into consideration Claimant's age, education, lack of work experience, and RFC, the ALJ concluded that he is able to make a successful adjustment and perform jobs existing in significant numbers in the national economy.  (R. 20-21.)

### III.    DISCUSSION

In challenging the ALJ's decision, Claimant proffers two arguments.  First, Claimant contends that the ALJ's RFC determination was not supported by substantial evidence.  (Pl. Mot. at 11-13.)  Next, Claimant argues that the ALJ erred in rendering her credibility determination.  (Pl. Mot. at 14-15.)

### A.    RFC Assessment

Claimant argues that the ALJ erred in her RFC assessment for two reasons.  First, he argues that the ALJ failed to reconcile the opinion of his treating physician Dr. Barrios with the medical evidence.  In her written opinion, the ALJ noted that she gave no weight to Dr. Barrios' medical source statement, "as his treatment notes do not

support his findings." (R. 19, 626-27.) The ALJ added that "Dr. Barrios [gave] examples of the claimant not seeking treatment for mononucleosis as evidence that his mother should have power of attorney; yet his mother lets the claimant go out alone and drive daily; he also sees his friends; and had a job and did not get into trouble." (R. 19.) The ALJ goes further to note that "Dr. Barrios last saw the claimant on April 26, 2011, and the letter claiming that the claimant is disabled is dated March 19, 2012." (*Id.*) The court finds the ALJ's reasons for discrediting Dr. Barrios' opinion to be insufficient.

First, the ALJ failed to explain why Dr. Barrios' medical opinion was not entitled to controlling weight. A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *See Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)). An ALJ must offer good reasons for discounting a treating physician's opinion. *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)).

Here, the ALJ appears only to have considered and attributed weight to Dr. Barrios' medical source statement rather than the whole of his treatment notes. The ALJ is correct that the last time that Dr. Barrios saw Claimant was on April 26, 2011. (R. 569-70.) However, the ALJ did not seem to consider Dr. Barrios' treatment notes dating back to January 2010 when he first began to treat Claimant. These treatment notes are pertinent to understanding Claimant's mental impairment, as they discuss Claimant's symptoms of grandiose features, hyper-verbal speech, reckless behavior, and mood swings. (R. 534, 540.) They also discuss his altercations with his mother's boyfriend because Claimant made a blow torch out of a spray can. (R. 540, 543.) The

Commissioner attempts to defend the ALJ's decision by arguing that Claimant misread Dr. Barrios' notes and that Dr. Barrios noted that Claimant did not burn his home with a make-shift blow torch. However, this argument is unavailing as the error is not in the misinterpretation of the treatment notes, but rather in the ALJ's failure to consider the treatment notes at all in her determination. Moreover, while the ALJ gave "no weight" to Dr. Barrios' medical source statement as his treatment notes did not support his findings, the ALJ failed to mention or explain the inconsistency. Again, the Commissioner attempts to defend the ALJ by arguing that Plaintiff failed to explain how the treatment notes would have supported a finding of disability. This argument also fails, as the ALJ is tasked with providing the requisite "good reasons" for denying controlling weight to a treating physician. *Campbell*, 627 F.3d 299 at 306; 20 C.F.R. § 404.1527(d)(2). The ALJ did not do so here.

The ALJ appears to have ignored the treating physician rule, which directs the ALJ to give controlling weight to the medical opinion of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence. *See* 20 C.F.R. § 404.1527(d)(2); *see also Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). "If the treating physician's medical opinion is well supported and there is no contradictory evidence, there is no basis on which the ALJ, who is not a physician, could refuse to accept it." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). However, once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight. *Id.* At that point the treating physician's evidence is just one more piece of evidence for the ALJ to weigh....and the rule goes on to list various factors that

the ALJ should consider, such as how often the treating physician has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, and so forth. *Id.* The checklist is designed to help the ALJ decide how much weight to give the treating physician's evidence. *Id.*

Again, here, the ALJ only addressed Dr. Barrios' medical source statement and there is no indication that the ALJ considered any of the remaining treatment notes of Dr. Barrios, who has the longest standing relationship with Claimant than any other doctor of record. While the ALJ claims that the medical source statement was inconsistent with the treatment notes, the ALJ goes no further to explain the inconsistency and thus the court is unable to determine whether there was cause for the ALJ to deny controlling weight to Dr. Barrios' medical opinion. And while it remains unclear as to what weight the ALJ assigned to Dr. Barrios' overall medical opinion, assuming that the ALJ did in fact deny Dr. Barrios controlling weight, she did not follow the second step of the treating physician rule, which directs the ALJ to go through the regulatory factors to determine the appropriate weight to designate to the treating physician's medical opinion. A reasonable review of the factors would appear to suggest giving controlling weight to Dr. Barrios, as he had an established treatment relationship with Claimant longer than any doctor on record, specialized in the field of psychiatry, and offered the initial evaluation of Claimant's mental impairments. (R. 534-35, 563-65.) Because the ALJ failed to follow the treating physician rule, remand is required for further evaluation of Dr. Barrios' treatment records.

Next, Claimant argues that the ALJ failed to consider his obesity when assessing his RFC. Though Claimant did not list obesity as an impairment in his disability

application, according to SSR 02-1P * 3 (S.S.A.), 2002 WL 34686281, an ALJ should consider the effects of obesity together with the underlying impairments, even if the individual does not claim obesity as an impairment. *See Clifford*, 227 F.3d 863 at 873. But a failure to explicitly consider the effects of obesity may be harmless error. This is especially the case where a claimant fails to articulate how obesity has further limited the conditions and functioning. *See Hernandez v. Astrue*, 277 F. App'x 617, 624 (7th Cir. 2008) (pointing out that the claimant "did not articulate how her obesity exacerbated her underlying conditions and further limited her functioning—as it was her burden to do.").

Here, Claimant argues that there was ample evidence of his obesity but the ALJ nevertheless failed to account for this impairment. However, Claimant's argument is insufficient on this point, as he has failed to show the court that he is more limited in his functionality due to his obesity. *See Hernandez*, 266 F. App'x 617 at 624 (citing *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006)); *see also Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("[B]ut here the claimant herself is silent in this regard, [and] we have repeatedly excused as harmless error the failure of an ALJ to explicitly address the claimant's obesity as SSR 02-1p prescribes so long as the ALJ demonstrated that he reviewed the medical reports of the doctors familiar with the claimant's obesity.") The ALJ considered Claimant's obesity but determined that it was a non-severe impairment. (R. 18.) After a review of the medical evidence, the ALJ reasonably concluded that "there is no evidence that alone or in combination with another impairment his obesity results in any work related limitations." (*Id.*) Because Claimant did not allege further limitations preventing him from engaging in work

activities, the court finds the ALJ's analysis of Claimant's obesity to be sufficient. *See*

*Prochaska*, 454 F.3d 731 at 736-37 (citing *Skarbek*, 390 F.3d 500 at 504 ("[A]lthough

the ALJ did not explicitly consider obesity it was factored indirectly into the ALJ's

decision.")). Though the ALJ's explanation may not have been explicit regarding

Claimant's obesity, this was harmless error.

**B.    Credibility Determination**

Claimant also believes that the ALJ's credibility determination was not supported

by substantial evidence, arguing in part that she failed to comply with SSR 96-7p. At

the outset, the court notes that the SSA has recently updated its guidance about

evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (March

16, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-

regulatory policies to "clarify that subjective symptom evaluation is not an examination

of the individual's character." SSR 16-3p at *1. Though SSR 16-3p post-dates the

ALJ's hearing in this case, the court will review the ALJ's determination in much the

same way as previously done. *See Cole v. Colvin*, No. 15-3883, 2016 WL 3997246, at

*1 (7th Cir. July 26, 2016) ("The change in wording is meant to clarify that [ALJs] aren't

in the business of impeaching claimants' character; obviously [ALJs] will continue to

assess the credibility of pain assertions by applicants, especially as such assertions

often cannot be either credited or rejected on the basis of medical evidence.").

As before, under SSR 16-3p, the ALJ must carefully consider the entire case

record and evaluate the "intensity and persistence of an individual's symptoms to

determine the extent to which the symptoms affect the individual's ability to do basic

work activities." SSR 16-3p at *2. The ALJ is obligated to consider all relevant medical

evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *Goble v. Astrue*, 385 Fed.Appx. 588, 593 (7th Cir. 2010). However, the ALJ need not mention every piece of evidence so long as she builds a logical bridge from the evidence to her conclusion. *Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008.) In making a credibility determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight*, 55 F.3d 309 at 314. Rather, SSR 16-3p requires the ALJ to consider familiar factors in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms, (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p at *7. Consequently, the court will only reverse the ALJ's credibility finding if it is "patently wrong." The ALJ's credibility determination is patently wrong if it lacks "any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Here, the ALJ evaluated Claimant's testimony under SSR 96-7p, but ultimately found it to be "not fully credible." (R. 20.) She gave several reasons for so finding, such as his ability to perform a variety of activities of daily living like driving, going out alone, testing, watching movies, playing video games, caring for the dog, and other chores. (*Id.*) Nonetheless, while the ALJ did list Claimant's daily activities, those activities are

fairly restricted to his household and not of a sort that necessarily undermines or contradicts his claims of having difficulty with his mental impairments when he is away from his family. *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) ("The ALJ should have explained the 'inconsistencies' between claimant's activities of daily living…and the medical evidence"); *see also Day v. Astrue,* 334 F. App'x 1, 8 (7th Cir. 2009) ("However, we have cautioned against placing undue weight on a claimant's household or outdoor activities, which the ALJ did here, in assessing his ability to work full-time."). Further, even while spending time with his family, Dr. Barrios' treatment notes indicate that Claimant had confrontations with his mother's boyfriend. (R. 540-41.) It was also reported in a psychological examination that he had poor short term memory, cannot concentrate fully on a task through to finish, and was unable to "demonstrate adequate ability in completing a multiple-step task." (R. 495-96.)

The ALJ also found Claimant incredible because, while she acknowledged that Claimant got stressed and confused in his last job, she accommodated for his inability to complete multiple tasks at work in her RFC assessment. (R. 20.) While the ALJ ostensibly accounted for Claimant's mental impairments by limiting him to "no more than occasional contact with coworkers and supervisors" and "two to three step simple repeated routine tasks," (R. 17), the Court is concerned that the ALJ did not fully consider the extent of Claimant's capabilities. Indeed, the SSA has explained a "claimant's [mental] condition may make performance of [even] an unskilled job as difficult as an objectively more demanding job." *See* SSR 85–15; *Craft*, 539 F.3d 668 at 677. Because the ALJ failed to build the requisite bridge between her findings and the

medical evidence, remand is required.  On remand, the ALJ shall conduct the symptoms evaluation as defined by SSR 16-3p.

## IV.    CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment is granted and the Commissioner's motion is denied.  This case is remanded to the SSA for further proceedings consistent with this opinion.  It is so ordered.

_____
**Michael T. Mason**
**United States Magistrate Judge**

**Dated: August 25, 2016**